IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| ARPAD A. ZARAA, | ) | Case No. 5:20-CV-1854 |
| | ) | |
| Plaintiff, | ) | JUDGE PATRICIA A. GAUGHAN |
| | ) | |
| v. | ) | MAGISTRATE JUDGE |
| | ) | THOMAS M. PARKER |
| COMMISSIONER OF | ) | |
| SOCIAL SECURITY, | ) | |
| | ) | **REPORT AND** |
| Defendant. | ) | **RECOMMENDATION**[1] |

Plaintiff, Arpad Zaraa, seeks judicial review of the final decision of the Commissioner of Social Security, denying his application for disability and child disability insurance benefits ("DIB" and "CDIB," respectively) under Title II of the Social Security Act. Zaraa challenges the Administrative Law Judge's ("ALJ") denial of his request to subpoena employment records from two of his former employers and the ALJ's negative findings with regard to the weighing of a neuropsychologist's medical opinion. Because the ALJ applied proper legal standards and reached a decision supported by substantial evidence, I recommend that the Commissioner's final decision denying Zaraa's application for DIB and CDIB be affirmed.

## I. Procedural History

On December 30, 2004, Zaraa was found disabled for depression and a non-verbal learning discrepancy. (Tr. 89).[2] He was found to still be disabled in 2012, due to bipolar

---

[1] This matter is before me pursuant to 42 U.S.C. §§ 405(g), 1383(c)(3), and Local Rule 72.2(b).

[2] The administrative transcript appears in ECF Doc. 12.

disorder and a learning disorder.  (Tr. 87-88).  On October 10, 2017, Zaraa's disability was found to have ceased as of October 17, 2017.  (Tr. 89-101).  Following a hearing, the decision was upheld upon reconsideration.  (Tr. 147, 158).  Zaraa requested an administrative hearing. (Tr. 165).

On April 2, 2019, prior to the administrative hearing, Zaraa's counsel requested that the ALJ issue two subpoenas for documents.  (Tr. 426).  He requested that subpoenas be sent to two of Zaraa's former employers, Charter Communications ("Charter") and a restaurant ("The Rail"), asserting that he had reached out to both and had been asked to provide a subpoena for the information from Charter but had not heard back from The Rail.  *Id.*  Zaraa's counsel's letter stated that he was requesting the subpoenas "for information that I believe is material and relevant to a full and fair adjudication" of the claim.  (Tr. 427).

Zaraa's counsel also attached to his request his communications with Charter and The Rail.  (Tr. 429-436).  These letters showed that Zaraa's counsel requested that the employers complete forms about any accommodations they made for Zaraa, his attendance, his work hours, his performance, and any related documents.  (Tr. 431-436).  Zaraa's counsel explained that the forms and related documents were to "enable [the ALJ] to understand certain facts about Mr. Zaraa's work" or because "The Social Security Administration ["SSA"] is interested in any work activity that [Zaraa] performs or tried to perform because work attempts can affect eligibility."  (Tr. 431-432).  On June 13, 2019, Zaraa's counsel renewed his request for the subpoenas, specifying that he thought the documents were "pertinent to the issues in this case involving [any substantial gainful activity] and the character of any work attempt."  (Tr. 443).

ALJ Susan Smoot heard Zaraa's case on July 30, 2019.  (Tr. 15).  At the hearing, the ALJ denied Zaraa's subpoena request for records from Charter Communications and The Rail.

(Tr. 38-39).  She acknowledged that the request was timely, but stated, "I didn't understand [what] you were expecting to prove with this so I think that your request for subpoena[s] for records were deficient," and she believed Zaraa would be able to provide testimony about the nature of his positions and why he left, so the information was not reasonably necessary for a full presentation of the case.  (Tr. 39).

In a September 20, 2019 decision, the ALJ denied Zaraa's claim.  (Tr. 15-26).  In her decision, at Step Four of the sequential evaluation process, the ALJ determined that Zaraa had the residual functional capacity ("RFC") to perform a full range of work at all exertional levels but with the following non-exertional limitations:

> [Zaraa] can perform simple and mildly detailed tasks and make simple and mildly detailed work-related decisions in an environment free of fast-paced production requirements or strict production quotas and with infrequent changes with changes explained.  He can have occasional interactions with others and should not be required to perform tasks that involve arbitration, confrontation, negotiation, directing the work of others or being responsible for the safety and welfare of others.

(Tr. 21).

Based on vocational expert testimony that an individual with Zaraa's age, experience, and RFC could work in available occupations as an electrical assembler, officer helper, and "Inspector – Hand Packager," the ALJ determined that Zaraa wasn't disabled because he could perform a significant number of jobs in the national economy.  (Tr. 25-26).  On June 25, 2020, the Appeals Council declined further review, rendering the ALJ's decision the final decision of the Commissioner.  (Tr. 1-3).  On August 20, 2020, Zaraa filed a complaint to seek judicial review of the Commissioner's decision.  ECF Doc. 1.

## II.    Evidence

### A.    Personal, Educational, and Vocational Evidence

Zaraa was born on June 7, 1986 and was about nine years old on the onset date of his

disability.  (Tr. 89).  He completed high school and an associate degree and was taking classes on

computer numerical control ("CNC") machining.  (Tr. 41, 44, 314).  Zaraa had previously

worked as a bar back employee, a security guard, and as a call center representative.

(Tr. 392-393).  Zaraa submitted evidence showing that he had previously requested an

accommodation for a learning disability with his call center representative job with Charter,

which was approved to the extent he requested additional mentoring/training but denied as to his

request that his production requirements be reduced.  (Tr. 714-716).

### B.    Relevant Medical Evidence

Zaraa exclusively focuses his challenge on the ALJ's Step Four assessment of a mental

health opinion; thus, it is only necessary to summarize the evidence related to his mental health

impairments.  *See generally* ECF Doc. 14.

On December 15, 2017, Zaraa saw Joseph Iemma, MD, for a six-month follow-up

appointment.  (Tr. 584-585).  Dr. Iemma noted that Zaraa's bipolar disorder was currently in

remission.  (Tr. 585).  The reported also indicated that Dr. Iemma and Zaraa had previously

discussed Zaraa's psychiatric medication and how Dr. Iemma did not prescribe certain

medication.  (Tr. 586).

On September 20, 2018, Zaraa was seen at Akron General Medical Hospital, presenting

with suicidal ideations.  (Tr. 635).  He reported that his depression had worsened over the last

month and his suicidal thoughts over the last week.  (Tr. 635-636).  He also reported three prior

suicide attempts.  (Tr. 636).  He was observed to be "distracted, sad, lamenting a lot, irritable,

and moody" in his mood; his affect to be broad and incongruent to his stated symptoms; his thought content was about life stressors; he had a linear, logical, and coherent thought form, poor insight, and his judgment was grossly impaired.  (Tr. 638).  After test results were within normal limits and he was medically cleared, Zaraa was discharged and counseled to return as needed.  (Tr. 641).

Zaraa also began an intensive outpatient program for counseling.  (Tr. 651).  During his counseling the same day, the therapist observed that Zaraa had a cooperative attitude, was appropriate and anxious/tense in affect, was anxious in his mood, had logical thoughts, and had normal speech.  (Tr. 644).  The therapist noted that he appeared attentive, engaged, and participative.  *Id.*  A subsequent session made generally the same observations.  (Tr. 648-649).  Zaraa was diagnosed with a generalized anxiety disorder; a recurrent major mood disorder, which was severe with psychotic symptoms; and ADHD.  (Tr. 650-651).

From September 21, 2018 to October 1, 2018, Zaraa sporadically attended his three daily counseling sessions, never attending more than a couple of days in a row.  (Tr. 657-691).  The therapists generally observed that Zaraa's behavior was appropriate and cooperative; his mood/affect was anxious, depressed, and distressed; and he had coherent thoughts, fair insight, fair judgment, and an intact memory.  (Tr. 660, 662, 664, 669, 672, 674, 679, 681, 683, 685, 688).  Generally, he was also noted as being engaged and participating in the sessions.  (Tr. 660, 662, 664, 672, 674, 681, 683, 685, 688).

On October 3, 2018, Zaraa's therapists met to discuss his condition, noting that he had not been attending the sessions regularly.  (Tr. 694).  The following day Zaraa reported that he would prefer to be discharged from the program so he could pursue his vocational training and academics.  (Tr. 695).

Also, on October 3, 2018, Zaraa saw psychologist Lauren Alexander, PhD.  (Tr. 719, 729).  Zaraa reported having mild-moderate depressed mood, anhedonia, and sleep disturbances. *Id.*  Testing showed that Zaraa had moderate depression and anxiety.  *Id.*  She reported that his attitude was open and cooperative, he had no observed impairments in his attention/concentration, his memory was intact, he had restless behavior, his mood was anxious and depressed, his affect was constricted, incongruent and goal-directed, he had a logical and goal-directed thought process, and he had no evidence of delusional thought content.  (Tr. 722).

From October 25, 2018 to July 8, 2019, Zaraa met with Dr. Alexander about once a month.  (Tr. 723-727, 886-904).  Generally, Dr. Alexander observed that Zaraa was open, cooperative, and restless in his behavior; and had no impairments in his attention or concentration, no memory issues, exhibited a mildly depressed mood, an affect incongruent with the topic of discussion, a logical and goal-orientated thought process, no delusions, fair insight, and good judgment.  (Tr. 723-724, 726-727, 887, 890, 893, 896, 899, 902, 905).  Later notes indicated that Zaraa was active and engaged during the sessions, and Dr. Alexander, generally, noted he was partially adhering to treatment, and his condition was inadequately controlled. (Tr. 887, 890, 893, 896, 899, 902).  Throughout the sessions, Dr. Alexander maintained her diagnosis of major depressive disorder, that was moderate and recurrent, and later, also included an unspecified personality disorder.  (Tr. 724, 727, 888, 890-891, 893-894, 897, 899, 902, 905). Dr. Alexander noted that Zaraa brought a copy of a 2017 neuropsychological testing report to a session she conducted on February 18, 2019, requesting that she, "'interpret' the findings to help prove that he should continue to receive Social Security disability."  (Tr. 898).

During this time, on May 30, 2019, Zaraa also established care with Jeffery Moore, MD, who took over his medication regime.  (Tr. 918, 923).  He was observed to have elevated blood

6

pressure and reported chronic heartburn, mild obstructive sleep apnea, occasional pulmonary symptoms, low energy, and increased sleep.  (Tr. 919).  Dr. Moore observed that Zaraa had clear speech, a logical thought process, tangential thought associations, guilty but normal thought content, fair insight, and fair judgment.  (Tr. 920).  Dr. Moore also observed that Zaraa had a normal memory, a cognitive impairment in his attention and concentration, was appropriate in affect, and had moderate anxiety mild depression.  *Id.*  Dr. Moore diagnosed Zaraa with bipolar I disorder and a learning disorder.  (Tr. 921).

    **C.**    **Relevant Opinion Evidence**

        **1.**    **Medical Source – Lauren Alexander, Ph.D.**

On December 5, 2018, Dr. Alexander wrote a letter to Zaraa's counsel discussing Zaraa's condition.  (Tr. 729).  She explained that she conducted an exam that measured his psychopathology, which indicated that he had unusual or markedly unconventional thinking and attitudes, as well as psychological distress.  *Id.*  Such results, she stated, were typically seen in individuals with long-standing disturbances.  *Id.*  She reported that his clinical profile was associated with depression, social withdrawal, agitation, difficulty concentrating, and fear of losing control over one's impulses.  *Id.*  She noted that this profile was characterized by distrust and alienation and those with it usually showed a strong underlying distrust of people, a suspicious questioning of their motives, and a profound fear of emotional involvement.  *Id.* These characteristics, she reported, created a fear of emotional involvement, and generally resulted in the individual being moody, hostile, unpredictable, negativistic, and, at times, emotionally inappropriate.  (Tr. 729-730).

## 2.     Medical Source – Joshua Magleby, Ph.D.

On November 28, 2017, Dr. Magleby completed a psychological evaluation report focused on Zaraa's vocational skills.  (Tr. 907).  He found Zaraa's thought content to be linear, future oriented, without loosening, irrationality, or confabulation.  (Tr. 910).  Zaraa's affect was flat, restricted, and appeared congruent.  *Id.*  Generally, Zaraa had a good mood without anxiety, depression, or marked mood swings.  *Id.*  Zaraa's mental content did not have any perceptual disturbances, and he was found to be fairly average in his ability to respond to mental status inquiry.  *Id.*  Dr. Magleby also found that Zaraa's judgment for confronting simple circumstances in daily life and understanding what was expected appeared "mostly adequate," although he was less successful in social situations.  (Tr. 911).

Overall, Dr. Magleby found that Zaraa's intelligence appeared to be high average, but his working memory was low average, and his processing speech was average, which suggested "some amount of cognitive ineffiency [*sic*] in daily functioning."  (Tr. 913).  He assessed that Zaraa's adaptive behavior was fairly average.  *Id.*  He found that Zaraa had a diagnosable mental disorder, demonstrating slight to mild cognitive inefficiency and depression symptoms.  *Id.*  The report noted: Zaraa's "MMPI-2 responses do not suggest bipolar disorder, but rather a history of depression symptoms that may be partly related to concerns for physical functioning.  There were no obvious signs of depression, however."  *Id.*

Vocationally, Dr. Magleby found that Zaraa appeared a fair candidate for rehabilitation, but his mood dysregulation and weak cognitive efficiency may interfere with his learning novel, work-related information or sustain his attention and quickly processing information, though not to a severe degree.  (Tr. 914).  He assessed that Zaraa had a fair potential to work, noting that his ability to understand, remember, and carry out simple oral instructions was similar to other adults

the same age; and, although he had some difficulty sustaining his attention and mental effort, it did not appear to affect his pace. *Id.* He noted, however, that Zaraa's social skills appeared somewhat impaired, as his social norms seemed atypical. *Id.*

### 3. Medical Source – Deanna Frye, Ph.D.

On March 22, April 3, and April 4, 2019, Zaraa saw consulting neuropsychologist Deanna Frye, PhD, who assessed Zaraa's neurocognitive functioning. (Tr. 731, 735). Dr. Frye's impression was that Zaraa had highly developed intellectual functions with significant disruption of attention functions and affective distress characterized by depressive symptoms. (Tr. 731). She diagnosed Zaraa with attention deficit hyperactivity disorder ("ADHD") and bipolar I disorder. *Id.* She observed that his speech was of a normal rate, rhythm, and prosody; his thought processes were logical, coherent, and goal-directed, with no evidence of hallucinations or delusions; and his mood was generally euthymic with congruent affect. *Id.* She noted that he became irritable and agitated at times during the testing, initially refusing to complete the tasks. *Id.* She reviewed the records from Dr. Alexander's meeting with Zaraa, Dr. Maglebey's evaluation, and other medical records. (Tr. 732-733).

Dr. Frye's own testing and evaluation showed that Zaraa had an average IQ in the 70th percentile of his peers, but the differences in the areas of his testing were reflective of relative weaknesses in his attention functioning compared to his higher cognitive processes. (Tr. 734-735). Other performance testing also indicated disruption related to inattention and impulsivity. (Tr. 735). Zaraa's memory function was low average to mildly impaired, but his executive functioning indicated average performance. *Id.* In summary, she noted that Zaraa had demonstrated an ability to consistently work full time for several months in a position that appeared to provide some natural accommodations for his attention concerns and required

minimal peer interactions, but he had significant difficulty with an employment setting that had added stresses and demands on his attention.  *Id.*

Frye also completed an RFC form for Zaraa.  (Tr. 739).  She reported that he could handle little changes in his work environment; simple, routine, and repetitive instructions, no strict production quotas, low stress, and could not handle other social interactions in the workplace.  *Id.*  He could travel, drive, or deliver for work.  *Id.*  He could only have superficial contact with the public, co-workers, and supervisors.  *Id.*  He also required extra reminders or assistance to properly perform work tasks and had issues with responding appropriately to regular/normal work criticism on a weekly basis.  *Id.*  She found that he would be absent more than 3 times a month and would be off task more than 15 percent.  (Tr. 740).

### 4.    Medical Sources – State Agency Psychological Consultants

On October 10, 2017, Jamie Lai, Psy.D., reviewed Zaraa's mental functioning based on the medical records.  (Tr. 98-100).  She found that Zaraa did not have any limitations in his understanding and memory.  (Tr. 98).  As to his concentration and persistence, Zaraa was moderately limited in his ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances, and to complete a normal workday and workweek without interruptions from psychologically based symptoms; but he was not otherwise significantly limited.  *Id.*  Dr. Lai found that Zaraa was also moderately limited in his ability to interact appropriately with the generally public; accept instructions and respond appropriately to criticisms from supervisors; and get along with coworkers or peers without distracting them or exhibiting behavioral extremes.  (Tr. 99).  Dr. Lia also found that Zaraa was not significantly limited in his adaptation skills.  *Id.*  Dr. Lai did, however, explain that Zaraa's "maladaptive personality traits and history of emotional dysregulation" would "somewhat" reduce his ability to

10

withstand stress related to work activities; but she concluded he "retained the capacity to work in settings where duties are fairly static."  *Id.*

On December 29, 2017, Courtney Zeune, Psy.D., completed a psychiatric review form. (Tr. 591).  She found that Zaraa had mild limitations in his ability to understand, remember, or apply information and in his ability to concentrate, persist, and maintain pace; but moderate limitations in his ability to interact with others and in adapting or managing himself.  (Tr. 603). Dr. Zeune also conducted a mental residual functional capacity assessment and found that Zaraa was not significantly limited in his understanding and memory.  (Tr. 607).  She determined that Zaraa had moderate limitations in his ability to carry out detailed instructions, maintain attention and concentration for extended periods, work in coordination with or proximity to others without being distracted by them, and complete a normal workday and workweek without interruptions from psychologically based symptoms, but was not otherwise significantly limited or limited at all in his ability to sustain his concentration and persistence.  *Id.*  Dr. Zeune also found that Zaraa was moderately limited in his ability to interact appropriately with the general public but was not otherwise limited in his social interactions.  (Tr. 608).  Similarly, he was moderately limited in his ability to respond appropriately to changes in the work setting but was not otherwise limited in his adaption.  *Id.*

### D.     Relevant Testimonial Evidence

Zaraa testified at the hearing.  (Tr. 40-73).  He stated that he lived with his father, but about a year prior he had lived on his own in an apartment.  (Tr. 40-41).  He could drive and had completed an associate degree.  (Tr. 41).  He subsequently tried to complete a bachelor's degree but was not successful.  (Tr. 41-42).  When he was studying, he would study one or two hours

every other day.  (Tr. 42).  When he was not working, he would study three or four hours a day.
(Tr. 43).  He was currently attending a trade school.  (Tr. 44).

Zaraa stopped college classes because he started a contract position with the Cleveland
Clinic, which required him to drive all over Northeast Ohio to collect data on credit card swipe
machines.  (Tr. 44, 56-57).  Immediately following the cessation of his benefits, he worked in a
cell center giving tech support for Charter.  (Tr. 47-48).  He worked approximately 9 months for
them at 40 hours a week, but the rate at which he needed to respond to phone calls increased
towards the end of his time there and caused him to have a panic attack.  (Tr. 48-49).  In that
role, he would just sit and answer the phone; he was not required to lift anything.  (Tr. 50).  For
that position, he requested further mentoring, which was provided, and had also requested an
accommodation with his metrics being outside of the norm, with regard to the rate of the calls he
answered, which was denied.  (Tr. 50-51).  He would call off an average of one or two days a
month to keep his anxiety at bay, but then he "started missing consistently," even receiving a
written warning about his attendance.  (Tr. 51).  The increased rate of calls, the ALJ
acknowledged, sounded stressful.  *Id.*

Zaraa next worked part-time as a security guard for about three months.  (Tr. 51-52).  He
stopped working because the job was distant, and his money all went to buy gas.  (Tr. 52).  He
then worked part time at a restaurant as a bar back, for less than 20 hours a week.  (Tr. 52-53).
He only worked there for about two weeks before he was let go because he could not memorize
the menu fast enough.  (Tr. 53).  Zaraa then worked the contract labor position at the Cleveland
Clinic cataloguing credit card machines.  (Tr. 54, 56).  He noted that there was tension between
himself and his supervisor based on his lunch breaks and how his productivity was measured.
(Tr. 55).

Zaraa asserted that he could not work a full-time job because, although he could get the job, he could not provide the kind of consistent results required.  (Tr. 58-59).  He said it was subjective whether his mental health had actually improved because he had bipolar disorder and the manic phases of that could easily be seen as improvement.  (Tr. 59).  He had lived alone but moved back in with his father because he could not afford the rent without a job.  (Tr. 60).  Living with his father, he would run errands and do laundry but was socially isolated during the day.  (Tr. 62).  He would also chat with online groups and play games online with others.  *Id.*

Zaraa explained that he consistently saw Dr. Alexander about once a month and began seeing Dr. Moore because his general practitioner no longer felt comfortable prescribing psychiatric medication.  (Tr. 64-65).  When he lived on his own, he would eat, bathe, take care of his personal business, and pay bills "with difficulty."  (Tr. 66).  He would ask his father for advice on how to organize his money, budget, and stay organized.  *Id.*

Zaraa explained that he dropped out of the college classes because his grades were going down as the difficulty of the curriculum increased.  (Tr. 67).  He had also spoken with various trade unions, but never got any work from those.  (Tr. 67-68).  Specifically as to Charter, he clarified that his absenteeism was "sparing," and he would purposely miss a day to keep his anxiety at bay; approximately one or two days a month before the work ramped up.  (Tr. 68-69).  The ALJ interjected, asking for clarification of whether he missed one or two days a month before the job demands increased or after those demands ramped up.  (Tr. 69).  Zaraa explained that he generally missed one or two days a month, and he missed more days when the job demands increased.  (Tr. 69-70).

Zaraa also explained that his depression was such that his personal care did not come to mind, and he needed to be reminded to change his clothes, brush his teeth, etc.  (Tr. 71).  He

13

believed that the reason he could not hold down a job was his inability to take a task and put the steps leading up to that task in order on his own.  (Tr. 71-72).  This inability, he believed, prevented him from having consistent results and was caused by his cognitive learning disability. (Tr. 72).  His social isolation was also caused by the anxiety he got around people and him not going well in personal interactions, due to a lack of social skills.  *Id.*  Even simple, repetitive, low-stress jobs, he believed he would struggle with based on his experience attempting to do so before his cessation date.  (Tr. 73).

## III.    Law & Analysis

### A.    Standard of Review

The court reviews the Commissioner's final decision to determine whether it was supported by substantial evidence and whether proper legal standards were applied.  42 U.S.C. § 405(g); *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007).  "Substantial evidence" is not a high threshold for sufficiency.  *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019).  "It means – and means only – such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Id.* (quotation marks omitted).  Even if a preponderance of the evidence supports the claimant's position, the Commissioner's decision still cannot be overturned "so long as substantial evidence also supports the conclusion reached by the ALJ." *O'Brien v. Comm'r of Soc. Sec.*, 819 F. App'x 409, 416 (6th Cir. 2020) (quotation marks omitted).  Under this standard, the court cannot decide the facts anew, evaluate credibility, or re-weigh the evidence.  *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 476 (6th Cir. 2003).  And "it is not necessary that this court agree with the Commissioner's findings," so long as it meets this low standard for evidentiary support.  *Rogers*, 486 F.3d at 241.  This is so because the

Commissioner enjoys a "zone of choice" within which to decide cases without being second-guessed by a court.  *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986).

Even if substantial evidence supported the ALJ's decision, the court will not uphold that decision when the Commissioner failed to apply proper legal standards, unless the legal error was harmless.  *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("[A] decision . . . will not be upheld [when] the SSA fails to follow its own regulations and [when] that error prejudices a claimant on the merits or deprives the claimant of a substantial right.").  And the court will not uphold a decision when the Commissioner's reasoning does "not build an accurate and logical bridge between the evidence and the result."  *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Charter*, 78 F.3d 305, 307 (7th Cir. 1996)); *accord Shrader v. Astrue*, No. 11-13000, 2012 U.S. Dist. LEXIS 157595 (E.D. Mich. Nov. 1, 2012) ("If relevant evidence is not mentioned, the court cannot determine if it was discounted or merely overlooked.").  Although the ALJ must discuss significant evidence supporting her decision and explain her conclusions with sufficient detail to permit meaningful review, there is no requirement that the ALJ incorporate all the information upon which she relied into a single tidy paragraph.  *See Buckhannon ex rel. J.H. v. Astrue*, 368 F. App'x 674, 678–79 (7th Cir. 2010) (noting that the court "read[s] the ALJ's decision as a whole and with common sense").

The SSA periodically reviews recipients' continued eligibility for disability benefits. 20 C.F.R. § 404.1594(a).  When a claimant challenges the cessation of benefits, the central issue is whether his or her medical impairments have improved to the point where he is able to perform substantial gainful activity.  42 U.S.C. § 423(f)(1); *Kennedy v. Astrue*, 247 F. App'x 761, 764 (6th Cir. 2007).  The Commissioner uses an eight-step sequential evaluation process to decide whether disability has ended and, thus, cessation of disability benefits is required.

20 C.F.R. § 404.1594(f).  Although the ALJ's review may cease at any point if there is sufficient evidence that the claimant is still unable to engage in substantial gainful activity, the complete sequential review poses eight questions that largely follow that of the five-step sequential evaluation process for initial disability claims.  *Compare* 20 C.F.R. § 404.1594(f), *with* 20 C.F.R. §§ 404.1520, 416.920.  They differ, however, in that, after determining whether the claimant's medical listing meet or equal a medical listing, the ALJ must ask whether there has been a medical improvement and, if so, whether it relates to the claimant's ability to work.  20 C.F.R. § 404.1594(f).  If there has been improvement, then the ALJ must ask whether an exception to medical improvement is met and, if not, he then asks whether all of the claimant's current impairments in combination were severe, followed by the same RFC determinations.  *Id.*  There is no presumption of continuing disability.  *Kennedy,* 247 F. App'x at 764 (citation omitted).  However, the "ultimate burden of proof lies with the Commissioner in termination proceedings." *Id.* (citation omitted).

### B.    Denial of Request to Issue Subpoenas

Zaraa argues that the ALJ abused her discretion in denying his request to subpoena his former employers to obtain information related to his absenteeism and productivity.  ECF Doc. 14 at 12-13.  Zaraa asserts that the subpoenas were necessary because his employers refused to provide information voluntarily, and he provided all the information required for a subpoena to be issued.  ECF Doc. 14 at 14-15.  Further, Zaraa contends that the ALJ's reason for denying the request for subpoenas – that Zaraa would be able to testify regarding his absenteeism and prior work at the ALJ hearing – was insufficient because the ALJ "rejected or did not believe" his testimony or the neuropsychologists' opinion about his absenteeism/off-task behavior.  ECF Doc. 14 at 14-16.  Moreover, Zaraa argues that the ALJ's failure to issue the

subpoenas resulted in a failure to develop a full and fair record.  ECF Doc. 14 at 16-18.  The Commissioner disagrees, asserting that Zaraa failed to explain at the time he requested the subpoenas what important facts the documents were expected to show and why these facts could not be proven without a subpoena, particularly as the cause of absenteeism must be shown to be due to a medical condition.  ECF Doc. 15 at 17-20.  Zaraa replies that sufficient information was provided to the ALJ to demonstrate the documents importance and for the ALJ to deny the request because he would testify and then reject his testimony was unreasonable.  ECF Doc. 16 at 1-4.

In *Lukkonen v. Comm'r*, 653 F. App'x 393, 403 (6th Cir. 2016) the Sixth Circuit restated the standard for reviewing claims of error related to subpoena denials: "An ALJ's decision regarding a claimant's request to issue a subpoena is reviewed for abuse of discretion.  *See Calvin v. Chater*, 73 F.3d 87, 88 (6th Cir. 1996)."  The Sixth Circuit continued, "'When it is reasonably necessary for the full presentation of a case, an administrative law judge or a member of the Appeals Council may, on his or her own initiative or at the request of a party, issue subpoenas for the appearance and testimony of witnesses . . . .'  20 C.F.R. § 416.1450(d)(1)."  *Id.*

The regulations provide that:

Parties to a hearing who wish to subpoena document or witnesses must file a written request for the issuance of a subpoena with the administrative law judge . . . at least 5 days before the hearing date.  The written requests must give the names of the witnesses or documents to be produced; describe the address or location of the witnesses or document with sufficient detail to find them; state the important facts that the witness or document is expected to prove; and indicate why these facts could not be proven without issuing a subpoena.

20 C.F.R. § 416.1450(d)(2); *see also* Social Security Administration Hearing, Appeals and Litigation Law Manual (HALLEX) I-2-5-78.B1 (claimant must make written request explaining what the evidence is expected to prove and showing that facts cannot be proven without a

subpoena).  Thus, a claimant seeking a subpoena must file a written request indicating why a subpoena is necessary and the important facts the subpoenaed documents are expected to prove. *Calvin v. Chater*, 73 F.3d 87, 90 (6th Cir. 1986).  It is reasonable to require a party who requests a subpoena to comply with the requirements of § 416.1450(d)(2), and a claimant is not entitled to issuance of a subpoena if he does not satisfy those requirements.  *Id*. at 92-93.

An ALJ is required to "develop the factual record fully and fairly" and to conduct a "full inquiry."  *Johnson v. Sec'y of Health & Human Servs*., 794 F.2d 1106, 1111 (6th Cir. 1986).  Because social security proceedings are "inquisitorial rather than adversarial," the ALJ is charged with developing the facts.  *Sims v. Apfel*, 530 U.S. 103, 110-11 (2000).  Although there is no bright-line test to determine when an ALJ has failed to develop the record fully, this court reviews the ALJ's decision to determine whether it is supported by substantial evidence.  *Lashley v. Sec'y of Health and Human Servs*., 708 F.2d 1048, 1052-53 (6th Cir. 1983).  Moreover, if an ALJ fails to develop the record fully, the reasons given for the determination would fail to "build an accurate and logical bridge between the evidence and the result."  *Fleischer*, 774 F. Supp. 2d at 877 (internal quotations omitted).

The ALJ did not abuse her discretion in determining that Zaraa's subpoena request was insufficient, and the documents were not necessary to develop the record.  *See Flatford*, 93 F.3d at 1300.  Zaraa limits his contention to the "importance" and necessity requirements of 20 C.F.R. § 416.1450(d)(2).  *See* ECF Doc. 14 at 12-16.  However, his contention ultimately fails because none of the documents provided to the ALJ in support of the subpoena – nor Zaraa's counsel's argument at the hearing – clarified their importance or demonstrated why the documents were necessary for a full and fair hearing.  In writing to the ALJ to request the subpoenas, Zaraa's counsel only asserted that: "I believe is material and relevant to a full and fair adjudication of

this claim." (Tr. 427).  He did provide the ALJ with copies of the letters sent to the two former employers. (Tr. 429-436).  But these documents only made the general claim that the information was "extremely relevant" or explained that the SSA was "interested in any work activity that [Zaraa] performs or tried to perform because work attempts can affect eligibility." (Tr. 431-432).  Citing the general relevancy of the documents alone, without more specific explanation of their importance, fails to meet the regulation's requirements.  *See* 20 C.F.R. § 416.1450(d)(2).

Moreover, the ALJ reasonably found that the documents were not necessary as alternative evidence was available.  Although Zaraa's testimony from a prior administrative hearing is not part of our record, he does not contest the ALJ's assertion that he had previously testified to his attendance and absenteeism.  *See generally* ECF Doc. 14.  The ALJ reasonably relied on the content of Zaraa's prior testimony, not for the truth of his assertions, but for his ability to speak about his job performance and absenteeism; thus, rendering the documents from the two employers unnecessary.  *Calvin*, 73 F.3d at 90; (Tr. 39, 147).  Additionally, the Commissioner correctly argues that Zaraa's absenteeism, for disability determination purposes, must be attributable to his medical impairments.  Based on the forms Zaraa's counsel sent to the Charter and The Rail, the records were unlikely to make that attribution.  *See* 42 U.S.C. § 423(d)(1) (defining disability as the "inability to engaged in any substantial gainful activity by reason of any medically determinable physical or mental impairment"); *Buckhannon ex rel. J.H.*, 368 F. App'x at 678–79; ECF Doc. 15 at 19.  Obtaining records showing that Zaraa was absent on certain days would not establish why he was absent.  And, as shown below, Zaraa made a record of his absenteeism.

Concerning his employment at Charter, Zaraa testified that, "I would call off an average of one to two days a month randomly to admittedly keep my anxiety at bay, but towards the end I started missing days consistently."  (Tr. 51).  He also added, "I was even given a written warning about my attendance and eventually things got out of hand and I broke down."  *Id*.  Thus, Zaraa's testimony about his absenteeism shows that the ALJ did not abuse her discretion in concluding that Zaraa did not need subpoenas because he could testify about his absenteeism.

Zaraa's merits brief attempts to augment his argument concerning the need for the subpoenaed information, contending that the records were necessary because of the ALJ later rejected Zaraa's testimony about his inability to remain at work or on task.  ECF Doc. 14 at 14-16.  However, this *post hoc* attempt to explain why the records were thought to be necessary cannot supply what was missing in the original request for subpoenas to be issued.  Whether the ALJ abused her discretion must be assessed as of the time the decision was made to deny the requested subpoenas.  Because the ALJ had not heard Zaraa's testimony at that point, Zaraa cannot point to the ALJ's later determination to discount his subjective symptom complaints as a reason why the subpoenas should have been issued in the first place.  I find that the Commissioner has the better argument concerning the ALJ's decision not to issue subpoenas requested by Zaraa.

Zaraa also contends that by rejecting the subpoenas the ALJ failed to fully and fairly develop the record.  The ALJ's decision was supported by substantial evidence, however, as she noted that Zaraa's testimony could provide the information and the subpoena requests were general and did not provide sufficient information to judge the importance of the documents.  *See Calvin*, 73 F.3d at 92-93; *Lashley*, 708 F.2d at 1052-53.  Because the ALJ explained her reasoning, which was based on the evidence and applicable regulations, I find that the ALJ did

not abuse her discretion in denying Zaraa's requested subpoenas.  *Flatford*, 93 F.3d at 1300;
*Fleischer*, 774 F. Supp. 2d at 877.  The ALJ's refusal to issue subpoenas at Zaraa's request
provides no basis upon which to reject the Commissioner's final decision.

### C.    Step Four: Weighing Opinion Evidence

Zaraa argues that the ALJ failed to adequately explain why she found Dr. Frye's opinion
regarding absenteeism and off-task behavior "not . . . fully persuasive."  ECF Doc. 14 at 18-23.
Zaraa asserts that Dr. Frye's opinion was supported by extensive testing, consistent with his
hearing testimony, and it would have been consistent with evidence obtained from employers
had the ALJ issued the requested subpoenas.  ECF Doc. 14 at 19-21.  Further, Zaraa contends
that *no evidence* in the record supported the ALJ's finding that Dr. Frye's opinion was
inconsistent with other evidence.  ECF Doc. 14 at 20, 22.  Thus, Zaraa argues that the ALJ's
failure to adequately explain why she discounted Dr. Frye's opinion left her decision
unsupported by substantial evidence and resulted in a failure to build an accurate and logical
bridge between the evidence and the result.  ECF Doc. 14 at 22.  The Commissioner disagrees,
asserting that "[c]onsidering the entire record" the ALJ's weighing of the opinion was supported
by substantial evidence.  ECF Doc. 20-25.  Zaraa replies that the Commissioner's *post hoc*
rationalizations justifying the ALJ's opinion could not be used to support the decision.  ECF
Doc. 16 at 4-6.

In determining the claimant's RFC, the ALJ must consider all the medical and other
evidence in the record.  20 C.F.R. § 404.1520(e); *Mills v. Comm'r of Soc. Sec.*,
No. 3:13-CV-423, 2015 U.S. Dist. LEXIS 99694, at *13 (S.D. Ohio Mar. 12, 2015) (applying the
regulations regarding the evaluation of medical opinions in the eight-step process for cessation of
benefits).  In doing so, the ALJ is required to "articulate how [she] considered the medical

opinions and prior administrative medical findings." 20 C.F.R. § 404.1520c(a).  At a minimum, the ALJ must explain how she considered the supportability and consistency of a source's medical opinion(s), but generally is not required to discuss other factors.  20 C.F.R. § 404.1520c(b)(2)[3].  According to the regulation, the more consistent a medical opinion is with the evidence from other medical and nonmedical sources, the more persuasive the medical opinion will be.  This is the consistency standard.  And the regulation specifies that the more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion, the more persuasive the medical opinion will be.  This is the supportability standard.  *See* 20 C.F.R. § 404.1520c(c)(1)-(2).  The SSA does "not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) . . . ." 20 C.F.R. § 404.1520c(a).

The ALJ applied the proper legal standards and reached a decision supported by substantial evidence in determining that Dr. Frye's opinion was only somewhat persuasive.  First, the ALJ identified inconsistencies between Dr. Frye's absenteeism and off-task findings and Zaraa's demonstrated experiences.  (Tr. 24).  Specifically, the ALJ pointed to Zaraa's ability to maintain positions without any excessive absenteeism or distractions.  *Id.*  And earlier in the decision, the ALJ referenced Zaraa's work during the period following his cessation as a back bar employee, a tech support call center employee, a security guard, and a medical records machine worker.  (Tr. 23).  Further, looking at the decision as a whole, the ALJ also considered the supportability of Dr. Frye's opinion, citing her earlier discussion of the neuropsychological evaluations and intelligence testing Dr. Frye performed.  *Buckhannon ex rel. J.H.*, 368 F. App'x

---

[3] Other factors include: (1) the length, frequency, purpose, extent, and nature of the source's relationship to the client; (2) the source's specialization; and (3) "other factors," such as familiarity with the disability program and other evidence in the record.  20 C.F.R. § 404.1520c(c)(3)-(5).

at 678–79; (Tr. 23-24).  From such, the ALJ built a logical bridge between the evidence and her

determination that Dr. Frye's opinion on Zaraa's anticipated absenteeism and time off-task was

not persuasive.  20 C.F.R. § 404.1520c(b)(2); *Fleischer*, 774 F. Supp. 2d at 877; (Tr. 24).

The ALJ's determination was also supported by substantial evidence.  42 U.S.C.

§ 405(g); *Rogers*, 486 F.3d at 241.  Such evidence includes: (1) Zaraa's testimony that he

generally took one to two days off at his Charter job on his own initiative; (2) Zaraa's testimony

that he missed more days "consistently" as the demands of his call center job increased; (3) the

ALJ's recognition in the RFC that Zaraa had nonexertional limitations related to the demands of

his work environment; and (4) Dr. Frye's own conflicting determinations that Zaraa had

demonstrated an ability to consistently work full time for several months but would be absent

three days a month.  (Tr. 51, 68-70, 735, 740).  Because the ALJ applied the proper legal

standards and reached a determination supported by substantial evidence, the ALJ's decision

falls within the ALJ's "zone of choice" and must be affirmed.  *Mullen*, 800 F.2d at 545.

In making this finding, the undersigned nevertheless acknowledges Zaraa's contention

that his own reports of missing work (at Charter and The Rail, among others) was consistent with

Dr. Frye's opinions regarding his absenteeism and off-task times at work.  But the court is not

permitted to re-weigh the evidence or reject the ALJ's decision simply because an alternate

explanation also has support.  Rather, even if a preponderance of the evidence were to support

Zaraa's contentions, the court is required to affirm the ALJ's conclusion when it is supported by

substantial evidence.  *O'Brien*, 819 F. App'x at 416.  And, here, Zaraa's successful engagement

as a contract employee at the Cleveland Clinic and his work at a security guard at Securitas,

without any report of excessive absenteeism or off-task periods is enough to support the ALJ's

conclusion that Zaraa, "has demonstrated the ability to perform goal-oriented work without

excessive absenteeism or distraction." (Tr. 24). And it is apparent that the ALJ identified types of work that would be even more likely within Zaraa's capabilities to perform. Under those circumstances, we have no choice but to affirm.

## IV.    Recommendation

Because the ALJ applied proper legal standards and reached a decision supported by substantial evidence, I recommend that the Commissioner's final decision denying Zaraa's application for CDIB and DIB be affirmed.

Dated: November 4, 2021

Thomas M. Parker
United States Magistrate Judge

---

## OBJECTIONS

Any objections to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days after being served with a copy of this document. Failure to file objections within the specified time may waive the right to appeal the District Court's order. *See U.S. v. Walters,* 638 F.2d 947 (6th Cir. 1981); *see also Thomas v. Arn,* 474 U.S. 140 (1985), *reh'g denied,* 474 U.S. 1111 (1986).